HORTENSIA RIVERA DAMIANI, demandante y apelante, *v.* EMILIO FAGOT, JR., demandado y apelado.

Número 10360.
*Sometido:* 9 de marzo de 1951. *Resuelto:* 29 de junio de 1956.

*Inés Acevedo de Campos* y *Rafael Muñoz Ramos,* abogados de la apelante; *Raúl Matos* y *Jaime A. García Blanco,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR NEGRÓN FERNÁNDEZ emitió la opinión del Tribunal.

Hortensia Rivera Damiani inició la presente acción contra Emilio Fagot, hijo, reclamando de éste daños y perjuicios por el alegado incumplimiento de su promesa de matrimonio. Las alegaciones de la demanda pueden resumirse así: El 23 de diciembre de 1947, y como resultado de relaciones amorosas que venían sosteniendo, el demandado convino con la demandante que contraerían matrimonio entre sí, formalizando mutuamente en esa fecha, en la residencia de la demandante en Guayanilla, su compromiso matrimonial; y habiéndolo comunicado ambos a los padres de la demandante, éstos consintieron, de acuerdo con el uso y la costumbre, al referido compromiso. Para esa fecha la demandante era mayor de edad, soltera y estudiante de la Universidad de Puerto Rico y el demandado era también mayor de edad, viudo y propietario, y tanto ella como él podían contraer matrimonio, sin que hubiera impedimento para poderlo contraer entre sí. La demandante y el demandado continuaron sus relaciones amorosas mientras llegaba el momento de su boda, y a requerimiento del demandado aquélla descontinuó sus estudios en la Universidad para poder permanecer "cerca de éste con mayor dedicación a sus amores y en vista de la proximidad del matrimonio." El demandado, sin causa ni motivo alguno que lo justificara y sosteniendo aún relaciones amorosas con la demandante, quebrantó su promesa, y el 11 de octubre de

1948 contrajo matrimonio en Ponce con otra dama, que es su actual esposa. La demandante estuvo en todo momento dispuesta a cumplir la promesa que había hecho al demandado, y así se lo expresó siempre—la última vez, 3 ó 4 días antes de éste contraer matrimonio.

En virtud de la actuación del demandado, la demandante alegó haber sufrido daños y perjuicios, ascendentes a $15,000, por los siguientes conceptos: (1) sufrimientos morales, angustias mentales, pérdida de salud, dolor, mortificaciones, ansiedad mental, humillación ante sus relacionados, amigos y familiares; (2) daños a su reputación ante la sociedad; (3) fracaso en sus estudios y en sus planes de preparación para el futuro; y (4) fracaso en sus perspectivas económicas basadas en su proyectado matrimonio con el demandado por ser éste persona de gran solvencia económica.

A la anterior demanda opuso el demandado moción de desestimación, fundándose en que aquélla no aducía hechos suficientes para constituir una causa de acción en su contra. Vista la misma ante uno de los jueces del tribunal a quo, fué declarada sin lugar. Contestó entonces el demandado, negando específicamente los hechos esenciales de la demanda, alegando otros en contrario, y reproduciendo, por vía de defensa especial,[1] su alegación de falta de hechos constitutivos de causa de acción, fundando la misma en que la acción ejercitada "no existe en la legislación civil de Puerto Rico ni está provista en el artículo 1802 del Código Civil, Edición de 1930."

---

[1] Dicha defensa especial fué discutida, con anterioridad al juicio, ante otro de los jueces del tribunal a quo y fué también por éste declarada sin lugar, "sin perjuicio del criterio que pueda adoptar este juez, después de leer el caso de *Claparols* v. *de Castro,* resuelto por la Corte de Primera Instancia por el distrito de Manila, Islas Filipinas, reportado en 43 Am. Law Rev. 759, el cual no hemos podido conseguir a pesar de las múltiples diligencias que hemos hecho al efecto." Como puede verse de los fundamentos de derecho que le sirvieron de base para declarar sin lugar la demanda, una vez celebrado el juicio, dicho magistrado rectificó su anterior criterio.

Celebrado el juicio en sus méritos, el tribunal declaró sin lugar la demanda, exponiendo sus fundamentos en conclusiones de derecho(²) que pueden sintetizarse así:

(1) La acción de daños y perjuicios por el incumplimiento de promesa de matrimonio no está autorizada por nuestro Código Civil ya que al no adoptarse los arts. 43 y 44 del Código Civil Español, la intención de nuestros legisladores fué erradicar totalmente dicha acción.

(2) Ni bajo las leyes generales de contratación ni bajo el art. 1054 de nuestro Código Civil procede la acción de daños y perjuicios por incumplimiento de promesa matrimonial.

(3) Aún suponiendo que la promesa matrimonial fuera un contrato la reclamación de daños estará limitada a los gastos

---

(²)El tribunal llegó también, entre otras, a las siguientes conclusiones de hecho:

"Que la demandante y el demandado sostuvieron relaciones amorosas por algún tiempo y allá para el día 23 de diciembre de 1947, el demandado convino con la demandante que contraerían matrimonio y así se lo comunicaron a los padres de la demandante. Tanto la demandante como sus padres aceptaron la promesa de matrimonio del demandado.

"Que el demandado requirió de amores a la demandante allá para el mes de noviembre de 1947, mientras ella estudiaba en la Universidad de Puerto Rico, y desde esa fecha en adelante hasta que se verificó el compromiso amoroso, el demandado le hacía visitas esporádicas en Santurce, Puerto Rico.

"Que a los 3 meses, más o menos, de haber formalizado compromiso amoroso, el demandado le escribió al padre de la demandante notificándole del quebrantamiento de este compromiso debido a la incompatibilidad de caracteres.

"Que durante el noviazgo, el demandado le hizo los siguientes regalos a la demandante:

"Sortija de matrimonio............................. $325.00
"Un reloj......................................... 100.00
"Ropa y cortes de trajes, más de.................. 100.00
"Pulseras y aretes................................ 25.00
"Zapatos y perfumes......$25.00 a................. 50.00

"Que después de quebrantar el compromiso amoroso con la demandante, el demandado contrajo matrimonio con su actual esposa.

"Que después que la demandante dejó sus estudios en la Universidad de Puerto Rico, continuó sus estudios en el Colegio Percy de Ponce.

"Que como consecuencia del incumplimiento de la promesa matrimonial por parte del demandado, la demandante ha sufrido angustias mentales, mortificación y ansiedad mental.

"Que la demandante cursó estudios universitarios por un semestre."

en que ella incurrió para la ceremonia nupcial no procediendo daños por el sufrimiento de angustias mentales como resultado de dicho incumplimiento.

Señalado como error del tribunal sentenciador el de haber declarado sin lugar la demanda por no existir causa en derecho para la acción ejercitada, sostiene en apelación la demandante que los arts. 43 y 44 del Código Civil Español no *creaban* una causa de acción por daños y perjuicios por incumplimiento de promesa matrimonial, sino que más bien *la limitaban;* y que no habiéndose incorporado a nuestro Código Civil Revisado de 1902 dichos artículos, tal limitación no existe y la acción procede bajo la autoridad del art. 1054 de nuestro Código Civil, en relación con los arts. 1042, 1043 y 1044 del mismo cuerpo legal.

Así resume la apelante, en su alegato, los fundamentos de su contención:

"La acción que interpone la demandante se funda en el art. 1054 del Código Civil porque se trata de una acción reclamando indemnización de daños y perjuicios por el incumplimiento de una obligación que ha contravenido el demandado apelado, no importa de qué modo. La obligación consiste de la promesa que hiciera a la demandante apelante en el sentido de que habría de casarse con ella. Tal promesa crea la obligación que nace del contrato celebrado entre ambos perfectamente encajada esta afirmación dentro del alcance del art. 1054 antes citado. No es una acción fundada en el art. 1802, porque no se trata de una ACCIÓN U OMISIÓN EN QUE HAYA INTERVENIDO CULPA O NEGLIGENCIA, CREADORA DE UNA OBLIGACIÓN QUE ANTES NO EXISTÍA. El art. 1802 del Código Civil equivalente al 1902 del Español se distingue del 1054 en que este último concede el remedio de daños y perjuicios contra aquéllos que de cualquier modo faltaren al cumplimiento de una obligación EXISTENTE, COMO REQUISITO PREVIO; en tanto que el 1802 concede el remedio como resultado de la culpa o negligencia que SIN LA EXISTENCIA DE UNA OBLIGACIÓN ANTERIOR y sin ningún antecedente contractual produce un daño o perjuicio teniendo su origen en un hecho ilícito. (Véase XII Manresa Comentarios al art. 1902 pág. 633 *et seq.*)".

Por su parte, el apelado sostiene que la acción por incumplimiento de promesa matrimonial no existe, ni está reconocida en forma alguna, en nuestro derecho, ya que la legislación vigente no contiene articulado específico alguno que autorice su ejercicio, por no haberse incorporado a nuestro Código Civil los arts. 43 y 44 del Español; que la promesa de matrimonio no es un contrato, y que la acción por el incumplimiento de dicha promesa tampoco puede incoarse amparándose en disposiciones de carácter general.

El Código Civil Español, que comenzó a regir en Puerto Rico el primero de enero de 1890—veinte días después de concluída su publicación en la Gaceta oficial el 12 de diciembre de 1889 conforme al Real Decreto de 31 de julio de ese año, *Torres et al.* v. *Rubianes et al.*, 20 D.P.R. 337—disponía, en sus arts. 43 y 44, lo siguiente:

"Art. 43. Los esponsales de futuro no producen obligación de contraer matrimonio. Ningún Tribunal admitirá demanda en que se pretenda su cumplimiento.

"Art. 44. Si la promesa se hubiere hecho en documento público o privado por un mayor de edad, o por un menor asistido de la persona cuyo consentimiento sea necesario para la celebración del matrimonio, o si se hubieren publicado las proclamas, el que rehusare casarse, sin justa causa, estará obligado a resarcir a la otra parte los gastos que hubiese hecho por razón del matrimonio prometido.

"La acción para pedir el resarcimiento de gastos, a que se refiere el párrafo anterior, sólo podrá ejercitarse dentro de un año, contado desde el día de la negativa a la celebración del matrimonio."

Las anteriores disposiciones quedaron fuera de nuestro derecho positivo al comenzar a regir en Puerto Rico, el 1ro. de julio de 1902, el Código Civil Revisado.

¿Significa la ausencia de dichos preceptos—según sostiene la apelante—que la promesa de matrimonio ha de regirse por las disposiciones de nuestro Código relativas a los contratos en general, y que, por lo tanto, su incumplimiento produce

las consecuencias jurídicas previstas en el art. 1054 (³) en que funda su reclamación de daños y perjuicios? ¿O significa la ausencia de tales preceptos —según sostiene el apelado— que nuestro Código no autoriza acción alguna para la reparación de los daños y perjuicios causados por el quebrantamiento culposo de dicha promesa?

## I

 Los esponsales—promesa recíproca de futuro matrimonio—cuyo origen como requisito prematrimonial se atribuye al Derecho griego, (⁴) se desarrollan en el Derecho romano, (⁵) y adquieren singular significación en el Derecho canónico. (⁶) En el Derecho español antiguo se manifiestan en el Fuero Juzgo, el Fuero Real y en las Partidas (⁷) Bajo

(³) Artículo 1054: "Quedan sujetos a la indemnización de los daños y perjuicios causados, los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier modo contravinieren al tenor de aquéllas."

(⁴) E. Menéndez, *El Matrimonio*, pág. 57: "Los griegos fueron los primeros que establecieron los esponsales como requisito prematrimonial, unido a lo que también hoy día conocemos con el nombre de 'arras'. Mediante las 'arras sponsalitia' el que ofrecía matrimonio, garantizaba su celebración por medio de una cantidad entregada a la otra parte que ésta hacía suya de no verificarse el matrimonio, como sanción civil del incumplimiento y en perjuicio del oferente."

(⁵) 2 Von Mayr, Historia del Derecho Romano (trad. de W. Roces) pag. 10. 2 Puig Peña, Derecho Civil, (Vol. 1) pág. 68, n. 3; 2 Scaevola, Código Civil, pág. 323; Radin *on Roman Law*, pág. 114 et seq.; 1 Manresa, Comentarios al Código Civil Español, pág. 331: "Entre los romanos, aunque los esponsales no producían obligación exigible en derecho, si uno de los prometidos había ofrecido arras, las perdía, mediante su negativa a contraer matrimonio, en beneficio del que persistía en cumplir su promesa (leyes 3a., 5a. y 6a. tít. I, libro 5, Cod.)."

(⁶) Marceliano Isábal, *Esponsales*, en 14 Enciclopedia Jurídica Española, pág. 918 et seq.; Manuel Jiménez Fernández, *Esponsales*, en Diccionario de Derecho Privado, Tomo I, pág. 1821 et seq.

(⁷) En el Fuero Juzgo: leyes 2a, 3a y 4a, tít. I, Libro III; en el Fuero Real; ley 10, tít. I, *Libro III*; y en las Partidas: ley 1ra. título I, Partida 4. Véanse Manresa, ob. y t. cit. pág. 331; Scaevola, ob. y t. cit. pág. 323; 2 Clemente de Diego, Instituciones de Derecho Civil, pág. 355; 1 Benito Gutiérrez, Códigos o Estudios Fundamentales sobre el Derecho Civil Español (2da. ed. 1868) pág. 231 et seq.

la última de estas leyes, de los esponsales celebrados con arreglo a Derecho nacía la obligación de contraer matrimonio, [8] que era exigible en ciertos casos mediante acción para su cumplimiento ante los tribunales eclesiásticos, [9] correspondiendo a éstos el conocimiento de las causas de esponsales, en lo relativo a su eficacia y rescisión, y a los tribunales ordinarios en lo relativo a las consecuencias económicas de indemnización de daños y perjuicios o restitución de bienes. [10] Los esponsales, sin embargo, fueron perdiendo

---

[8] El efecto jurídico de esta obligación, afirma Sánchez Román, "es puramente teórico, pues ni la legislación civil, ni la canónica, ni los Tribunales civiles, ni los eclesiásticos, han considerado que debían condenar al estricto cumplimiento de esta obligación de casarse contra la voluntad de cualquiera de los contrayentes." 4 Sánchez Román, Derecho Civil, págs. 482, 483.

Véase también el comentario de Francisco de Cárdenas en su Introducción al Tomo I de Manresa, Comentarios al Código Civil Español, pág. 25.

[9] En esa época el carácter de los esponsales era más religioso que civil. La indeseabilidad de los matrimonios forzados produjo, para atenuar sus males, la Pragmática de 23 de marzo de 1776 (ley 9a. tít. II, libro X, Novísima Recopilación) por la cual se exigió el consentimiento del padre o la madre para que los hijos celebrasen esponsales, y después, la de 1ro. de abril de 1803, por la cual no se consideraban eficaces los esponsales que no se hubiesen otorgado en escritura pública ni se admitían por los tribunales eclesiásticos demandas para hacer efectivo el compromiso sin tal formalidad contraído.

La ley de matrimonio civil de 1870 declaró que no produciría obligación civil la promesa de futuro matrimonio. Esta ley rigió en ese extremo tan sólo hasta el 9 de febrero de 1875 y con su derogación cobraron nueva vida los esponsales, ya en desfavor, hasta la aprobación del Código Civil. Marceliano Isábal, colab. citada, a la pág. 927; Puig Peña, ob. y t. cit., pág. 72; Scaevola, ob. y t. cit., pág. 323; 3 Castán, Derecho Civil, Común y Foral (6ta ed.) pág. 465 et seq.

[10] Sánchez Román, ob. y t. cit. pág. 484.

El Tribunal Supremo de España reconoció la procedencia de la acción "para reclamar daños y perjuicios ocasionados por uno de los contrayentes por *incumplimiento de un contrato solemne de esponsales*", considerando "que las cuestiones que surgen acerca del *cumplimiento de un contrato* celebrado conforme a las leyes y a las buenas costumbres deben resolverse con arreglo a lo pactado, porque es la ley principal para las partes." (Bastardillas nuestras.) Sentencias de 13 de enero de 1879, 41 Jurisprudencia Civil 23, y de 21 de enero de 1881, 45 Jurisprudencia Civil 171.

564

el favor de la opinión pública.($^{11}$) La crítica jurídica española abogaba por la abolición de esa institución.($^{12}$)

■ Así advino al Derecho español la nueva declaración sobre los esponsales contenida en los arts. 43 y 44 del Código Civil. Algunos autores advierten en esa figura la característica principal del precontrato, aunque por efecto de los citados artículos—que impiden la acción dirigida a su cumplimiento específico—le niegan relación alguna con el contrato preliminar.($^{13}$) En general, sin embargo, la doctrina clasifica los esponsales como una de las variedades del contrato de promesa—preparatorio del matrimonio—que participa del carácter de institución de Derecho de familia y también del de institución de Derecho contractual($^{14}$) reputándolos como "una convención lícita de efectos limitados", ($^{15}$)

---

($^{11}$) Clemente de Diego, ob. y t. cit. pág. 355: "Los esponsales o desposorios, de larga tradición en nuestra historia jurídica (Fuero Juzgo, Real, Partidas, Pragmáticas de 23 de marzo de 1776 y 1ro. de abril de 1803) fueron motivo de muchos escándalos, por lo que perdieron en consideración ante la opinión pública."
Véase también, 2 Scaevola, ob. y t. cit. pág. 324.
($^{12}$) Benito Gutiérrez, Códigos o Estudios Fundamentales sobre el Derecho Civil Español, 2da. ed. (1868), tomo I, pág. 222. García Goyena, en Concordancias, Motivos y Comentarios del Código 'Civil Español (ed. 1852), tomo I, pág. 56 se expresa así: "En manos de un seductor hábil son un arma para combatir la virtud de una joven apasionada o de inferiores circunstancias; en las de una mujer artera e hipócrita de pudor, serán un lazo para enredar a un hombre locamente enamorado: más de una vez los padres y tutores los emplearon para asegurar sus combinaciones de interés, de ambición o vanidad, comprometiendo anticipadamente a sus hijos menores."
Véase la cita que hace Clemente de Diego, ob. y t. cit. pág. 355, del criterio expresado en 1852 por Francisco de Cárdenas sobre los esponsales, en el sentido de que era "preciso purgar nuestro Derecho de una mala institución, algo caída ya en desuso, pero de graves inconvenientes para el interés público y el bien de las familias."
($^{13}$) José Alguer "Para la Crítica del Concepto del Precontrato", en 22 Revista de Derecho Privado, págs. 321, 375.
($^{14}$) 4 Sánchez Román, ob. cit. pág. 482; 3 Castán, ob. cit. (6ta. ed.) pág. 337; Puig Peña, ob. y t., págs. 69–70.
($^{15}$) 3 Castán, ob. cit. (6ta. ed.) pág. 337; 4 Valverde, Tratado de Derecho Civil Español, pág. 75; Luis Muñoz, Comentarios a los Códigos Civiles de España e Hispanoamérica (1953) pág. 106; Clemente de Diego, ob. y t. cit. pág. 355: "En su naturaleza son un convenio, y, hasta si se

aunque se ha llegado a abogar, por considerárseles desprovistos de eficacia jurídica, que se prescinda del art. 44.([16]) Los preceptos del Código Civil Español no dejan duda, sin embargo, respecto a la procedencia del resarcimiento de los gastos incurridos por razón del matrimonio prometido—no a la indemnización de los perjuicios—([17]) fundado ello en la naturaleza contractual que se atribuye a los esponsales.([18])

## III

No es propicio el estado actual de nuestro derecho positivo para dar carácter de contrato legal a la promesa de

---

quiere, un contrato accesorio y preparatorio de matrimonio, pero que no conducen necesariamente a éste, son una imagen anticipada del matrimonio, sin la intensidad ni extensión de efecto de éste."

Puig Peña parte de la tesis de que los esponsales son un propio *contrato*. Ob. y t. cit. págs. 69–70.

Juan Ríos Sarmiento en su colaboración "La Familia", en Enciclopedia Práctica de Derecho, de Fenech (1952) pág. 13, describe así la promesa esponsalicia: "El Código Civil no le llama contrato, sino promesa; pero en realidad es un contrato, unilateral o bilateral."

En el Derecho italiano, véase Rotondi, Derecho Privado, pág. 548; R. Bruggi, Instituciones de Derecho Civil, pág. 411 et seq.

([16]) Comas, La Revisión del Código Civil Español, Tomo II, Parte Especial, págs. 134–135.

León Bonel y Sánchez, en Código Civil Español, Tomo I, pág. 118, se expresa así sobre los esponsales: "Esta promesa que en algún tiempo tuvo su fuerza y cuya falta de cumplimiento se castigaba con pérdida de cantidades, dotaciones para la esposada y en otras formas que aquí sería prolijo enumerar, hoy no tiene fuerza alguna ante la ley e infecundo sería cuanto sobre esto se dijese."

Y Falcón en Código Civil, Tomo I, pág. 83, comentando el art. 44, anota: "Es un precepto nuevo en nuestro derecho; pero no nuevo en el derecho de otros pueblos. Algunos Códigos, como el de Francia y Holanda, guardan silencio sobre los esponsales. Otros como los de Austria, Prusia y Baviera, reconocen su validez, cuando se otorgan con ciertas condiciones. Otros como el de Portugal, les niegan siempre eficacia. Pero aún los Códigos que admiten los esponsales, no les reconocen eficacia más que para obligar a los que faltan a la promesa a resarcir los daños y perjuicios que por su incumplimiento causan unas partes contratantes a las otras."

([17]) 1 Martínez Ruiz, Código Civil, pág. 260.

([18]) Ortega Pardo, La Ruptura de Esponsales en el Derecho Español Vigente, en 177 Revista General de Legislación y Jurisprudencia, págs. 611, 614 et seq.

matrimonio. ([19]) Nada hay en nuestro Código Civil que permita atenuar el rigor del concepto escueto de institución de Derecho contractual que en tal caso habría que atribuirle, para crear—sin el auxilio del concepto de institución de Derecho de familia que el Código Civil español le presta—la figura híbrida del contrato esponsalicio español de efectos limitados. La doctrina del Derecho español contemporáneo sobre la naturaleza de los esponsales—que, como hemos visto, tiene su base en preceptos específicos del Código—no es asimilable por nuestro Derecho, que no adoptó esos preceptos. ([20])

---

([19]) En el caso de *Lara* v. *Ortega*, resuelto por la Corte de Distrito de los Estados Unidos para Puerto Rico el 6 de julio de 1905, un jurado concedió daños y perjuicios por el rompimiento en 1904 de una promesa de matrimonio hecha en 1900, bajo instrucciones al efecto de que las leyes de Puerto Rico, como las de Estados Unidos, consideraban el contrato de matrimonio como un contrato civil; que un convenio de esponsales se consideraba, en ley, un contrato, y que su incumplimiento sin causa justificada daba origen a una acción de daños y perjuicios, sin que estuviera limitada ésta al mero resarcimiento de gastos de que hablaba el art. 44 del Código Civil Español, ya fuera de nuestra legislación desde el 1ro. de julio de 1902.

(La apelación contra esta sentencia fué desestimada por falta de jurisdicción por el Tribunal Supremo Nacional en *Ortega* v. *Lara*, 202 U. S. 340, 50 L. Ed. 1055.)

No estamos obligados, desde luego, por la definición y el alcance fijados a nuestro Derecho, a la luz de reglas del Derecho angloamericano, por el tribunal federal en dicho caso.

([20]) Muñoz Morales, en 1 Anotaciones al Código Civil de Puerto Rico, págs. 25–26, apuntando las principales modificaciones del Código Civil Revisado de 1902, señala: "El título IV de este Código Revisado se ocupa del *matrimonio;* y su capítulo I contiene un solo artículo definiéndolo como una institución civil que procede de un contrato. En su consecuencia se suprime todo lo relativo al matrimonio canónico y disposiciones comunes a ambas formas de que trataba el Código Español." Entre esas disposiciones comunes y ambas formas de matrimonio el Código Español contenía los arts. 43 y 44.

Para el texto de la revisión propuesta en cuanto a matrimonio y divorcio véase el Informe de la Comisión para Revisar y Compilar las Leyes de Puerto Rico, tomo II, partes IV y V (1901) pág. 633. Y para los Comentarios sobre esa misma revisión—en los cuales nada se indica respecto a la materia de esponsales—véase el Informe citado, tomo I, págs. 201–3.

La situación del Derecho puertorriqueño es comparable a la del Derecho francés, ([21]) cuyo Código Civil no contiene disposiciones equivalentes a las de los arts. 43 y 44 del Código Civil Español. La jurisprudencia francesa, siguiendo el precedente establecido por el Tribunal de Casasión en sentencia de 30 de mayo de 1838 ([22])—y con ella los principales exponentes de la doctrina ([23])—sostiene unánime y consistentemente que la promesa de matrimonio es nula en sí, porque atenta a la absoluta libertad con que deben entrar los contrayentes al acto mismo del matrimonio, libertad ésta que proclama como un principio de orden público. Siendo nula la promesa de matrimonio, no puede derivarse de ella una obligación legal, y no cabe invocar el art. 1140 del Código Civil Francés—equivalente al 1054 del nuestro—para reclamar daños por su mero incumplimiento. Ello, no obstante, reconoce la acción de daños y perjuicios cuando la ruptura de la promesa es injustificada y causa perjuicios reales a la otra parte. La acción entonces no la funda en la validez de la promesa, sino en la existencia del perjuicio causado, proveniente de la culpa del prometiente, bajo el art. 1382 del Código Francés—1802 del nuestro. ([24])

---

([21]) En Luisiana se reconoce a la promesa de matrimonio carácter de contrato, y se conceden daños bajo las disposiciones del art. 1934 de su Código Civil—equivalente, en parte al 1059 del nuestro, *Morgan* v. *Yarborough*, 5 La. Ann. 316 (1850); *Smith* v. *Brann*, 37 La. Ann. 225; *Johnson* v. *Levy*, 118 La. 447, 43 So. 46. Véase también 24 Tulane L. Rev. 501 et seq.

([22]) *Bouvier* v. *Contreau*, S. 1938, I. 492. Para el texto original de esta decisión y comentarios sobre la misma, véase Capitant, *Les Grands Arretts de la Jurisprudence Civile*, 2da. ed., Paris (1940), págs. 15-16. Véase, además, Brockelbank, *The Nature of the Promise to Marry–A Study in Comparative Law*, 41 Ill. L. Rev. 1, 24-25. El análisis de Brockelbank sobre el estado del Derecho francés a partir de esta decisión aparece a las págs. 19-23 de dicho estudio.

([23]) 2 Laurent, Principios de Derecho Civil, trad. castellana (1912) pág. 452 et seq.; 2 Planiol-Ripert, Derecho Civil Francés, trad. española (1939) pág. 66 et seq.; 1 Colin y Capitant, trad. española (1952), pág. 310 et seq.

([24]) Los tribunales franceses consideran que "la ejecución de una promesa de matrimonio no puede por sí misma motivar una condena de daños y perjuicios, porque 'atentaría indirectamente a la libertad del

Nuestro Código reputa el matrimonio como una institución civil: esa es la institución familiar que constituye la unidad básica de la Sociedad. Para llegar a formarse, requiere la celebración de un contrato matrimonial conforme a las prescripciones de ley: esa es su procedencia, no reconoce otra. Entre los requisitos para su validez está el consentimiento de los contrayentes, voluntad ésta que se expresa en el acto mismo de la ceremonia. Es de orden público que esa voluntad sea expresada libremente, por el interés del Estado en la preservación de su entidad social básica.

matrimonio'. En otros términos, el consentimiento futuro para contraer el matrimonio que se proyecta no puede ser objeto de una promesa eficaz. La ruptura de esta promesa sólo puede dar lugar a una indemnización de los daños y perjuicios al futuro esposo abandonado cuando aquélla va acompañada de circunstancias que hacen de ella una falta perjudicial", criterio que sustentan como "una aplicación jurídica de las disposiciones del artículo 1382 del Código Civil que no viola ninguno de los principios de nuestro Derecho". Colin y Capitant, ob, y t. cit., pág. 314.

La tesis de la jurisprudencia y la doctrina francesa prevalecientes se funda en que "el matrimonio está fuera del comercio y no puede ser objeto de una obligación de hacer. Según lo ha dicho muy justamente Laurent 'una promesa de matrimonio no es la promesa hecha por un deudor a su acreedor' la idea del antecontrato no puede tampoco ser aceptada, puesto que el matrimonio no es ya un puro contrato, sino también una institución, a la cual se adhiere la voluntad de los esposos con toda libertad." Planiol-Ripert, ob. y t. cit., pág. 67.

"Al rechazar la tesis de la validez de la promesa de matrimonio como convención civilmente obligatoria, la jurisprudencia no ha querido que el autor de la ruptura sea inmune a toda reparación, cuando esa ruptura causa un perjuicio a su ex-novio. Las mismas sentencias que han rechazado el pago de daños y perjuicios en virtud del art. 1142, han hecho aplicación de los artículos 1382 y 1383." Planiol-Ripert, ob. y t. cit., págs. 68-69.

"¿Qué es lo que constituye la esencia de esta unión [el matrimonio] desde el punto de vista jurídico? La libertad más absoluta en el acto en que se celebra. De aquí el que la promesa de matrimonio no pueda engendrar un lazo de derecho; esto quiere decir que no es obligatoria; de consiguiente, es nula. Para admitirla, se necesitaría una disposición expresa en el Código; basta que éste guarde silencio para que la promesa no sea válida." Laurent, ob. y t. cit., pág. 457.

Fundado en el anterior principio ha quedado consignado por la jurisprudencia y la doctrina que "el sólo hecho de la no ejecución de un matrimonio proyectado, no puede por sí mismo motivar una sentencia a daños y perjuicios, toda vez que esto sería, bajo una forma nueva, atentar a la libertad del matrimonio. Si, pues, ha lugar a condenar a daños y

Adoptamos, por más racional y conforme a nuestro Derecho,(25) la tesis del Derecho francés que niega eficacia jurídica a la promesa de matrimonio y que funda la acción de daños y perjuicios, no en orden a un contrato—art. 1054— sino en orden a la actuación culposa del prometiente que ha causado los daños—art. 1802(26)

## IV

█ Los requisitos para determinar la responsabilidad del prometiente—conforme a las reglas generales de la res-

perjuicios al que ha faltado a una promesa de matrimonio, no se puede fundar esta sentencia en un compromiso que se deriva de un contrato. La verdadera razón para decidirlo se encuentra en el art. 1382, según el cual 'cualquier acto del hombre que cause daño a otro, obliga a reparar la falta al que la ha cometido'. Por consiguiente, en virtud de un delito civil o de un cuasidelito, es como se declara la indemnización de daños y perjuicios contra el que falta a una promesa de matrimonio; éste se halla obligado no porque hizo una promesa sino porque a consecuencia de ella la otra parte ha experimentado un daño, ya material, ya moral." Laurent, ob. y t. cit., pág. 463.

Véase también 1 Henri y Leon Mazeaud, Tratado Teórico y Práctico de la Responsabilidad Civil, trad. española, págs. 61–62.

(25) En el derecho consuetudinario anglo-americano se atribuye a la promesa de matrimonio carácter de contrato, cuyo incumplimiento da origen a una acción de daños y perjuicios. El desfavor público en Estados Unidos hacia esta clase de acciones ha movido a un gran número de estados a aprobar leyes que las prescriben. Brockelbank, *The Nature of Promise to Marry-A Study in Comparative Law*, 41 Ill. L. Rev. 1; Feinsigner, *Legislative Attack on "Heart Balm"*, 33 Mich. L. Rev. 979; Brown, *Breach of Promise Suits*, 77 U. of Pa. L. Rev. 474; Wright, *The Action for Breach of Marriage Promise*, 10 Va. L. Rev. 361; Cousens, *The Law of Damages as Applied to Breach of Promise of Marriage*, 17 Cornell L.Q. 367.

Véanse, además, *Abolition of Actions for Breach of Promise, Enticement, Criminal conversation and Seduction*, 22 Va. L. Rev. 205; *Physical and Mental Conditions as a Defense in Breach of Promise*, 83 U. of Pa. L. Rev. 998; *Avoidance of Incidence of Anti-Heart Balm Statutes*, 52 Col. L. Rev. 242.

(26) En Filipinas, donde los arts. 43 y 44 del Código Civil Español que se hizo extensivo a dichas Islas dejaron de regir desde el 31 de diciembre de 1889—*Benedicto* v. *De La Lama*, 3 Jur. Fil. 34—el Tribunal Supremo ha reconocido la procedencia de indemnizar daños y perjuicios en esta clase de acciones fundándose en el concepto de la culpa—art. 1902—del Código Civil de Filipinas, que es el 1802 del nuestro. *García* v. *del Rosario* (1916), 33 Jur. Fil. 204, 208.

ponsabilidad civil—son, según la doctrina al efecto([27]) (1) culpa del demandado; (2) perjuicio al demandante y (3) relación de causa a efecto entre la culpa y el perjuicio. La *culpa* consistirá de la ruptura injustificada, o sea, de la promesa que ha sido violada sin motivos legítimos. A esos fines la promesa no se invoca como *contrato*, sino como *hecho*. El *perjuicio* a ser indemnizado incluye tanto el perjuicio material causado como el perjuicio moral. Y la *relación de causa a efecto* debe surgir, como es natural, entre la ruptura culposa y el daño sufrido.

## V

■■ Consideramos—a base de la prueba pasada en el tribunal inferior—que los tres elementos fundamentales arriba apuntados están presentes en el caso de autos. Dicha prueba justifica([28]) una determinación de responsabilidad culposa de parte del demandado y daños a la demandante provenientes directamente de la actuación de aquél.

El resultado a que hemos llegado en cuanto a la procedencia y naturaleza de la causa de acción ejercitada, conlleva la revocación de la sentencia que declaró sin lugar la demanda. No devolveremos, sin embargo, el caso al tribunal sentenciador para ulteriores procedimientos, toda vez que teniendo ante nos las conclusiones a que llegó dicho tribunal y la prueba íntegra, testifical y documental, estamos en condiciones de hacer nuestra propia determinación de daños.

Los sufrimientos morales y angustias mentales, mortificación y humillación ante la sociedad, se fijan en la suma de $1,500. No hay prueba que justifique conceder las partidas reclamadas separada y especialmente de "daños a su reputación ante la sociedad" y "fracaso en sus estudios y en sus planes de preparación para el futuro". La partida recla-

---

([27]) Planiol Ripert, ob. y t. cit., pág. 70 et seq.

([28]) Las conclusiones de hecho del tribunal sentenciador no comprenden todos aquellos extremos que, de haber considerado la acción ejercitada como una de daños y perjuicios derivada del art. 1802 del Código Civil, hubiera sido procedente incluir en ellas.

mada por concepto de "fracaso en sus perspectivas económicas basadas en su proyectado matrimonio con el demandado por ser éste persona de gran solvencia económica" no procede dentro de esta acción. Laurent, ob. y t. cit., pág. 465.

*Por los fundamentos expuestos, la sentencia será revocada y se dictará otra en su lugar declarando con lugar la demanda, condenando al demandado a pagar a la demandante la suma de $1,500 por concepto de daños y perjuicios, las costas, y $300 para honorarios de abogados.*

El Juez Asociado Sr. Marrero concurre en el resultado.
El Juez Asociado Sr. Pérez Pimentel no intervino.